# DECLARATION OF SPECIAL AGENT MATTHEW FUTCH

I, Matthew A. Futch, declare and state, pursuant to 28 U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, that the following is true and correct to the best of my knowledge, information and belief:

I, Matthew Futch, am an "investigative law enforcement officer" of the United States of America, within the meaning of Section 2510(7) of Title 18, United States Code; that is, an officer of the United States empowered by law to conduct investigation of, and to make arrests for, offenses enumerated in Section 2516 of Title 18, United States Code.

I am a Special Agent (SA) with the United States Drug Enforcement Administration (DEA), Raleigh District Office (RDO). Prior to the assignment at RDO, I was assigned to the Midland Resident Office (MRO). In September 2016, I received twenty weeks of training at the DEA Academy in Quantico, Virginia, to become a Special Agent. I have received extensive training pertaining to narcotic investigations and the investigation of various crimes which arise from drug trafficking activities. Prior to my employment with DEA, I was employed as a Deputy Sheriff with the Orange County Sheriff's Office in Orlando, Florida where I conducted investigations relating to various violent and narcotic related felony offenses. I am a graduate of Florida State University with a Bachelor's Degree in Political Science and English. In connection with my official DEA duties, I investigate criminal violations of federal drug and money laundering laws and related statutes, including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, and 846, and Title 18 United States Code, Sections 371, 1952, 1956, 1957, and 924(c)(1).

I am familiar with and have participated in all of the normal methods of investigation, including, but not limited to, visual surveillance, the general questioning of witnesses, the use of sources of information, the use of pen registers and undercover operations and the use of communications and electronic monitoring as provided by law. I have testified in judicial proceedings and prosecutions for violations of various controlled substance laws as both a fact and expert witness.

I have received specialized training in the enforcement of drug laws. I have also received specialized training in the investigation of drug trafficking and drug organizations, including training in drug recognition and terminology, undercover operations, interviewing techniques, financial/money laundering investigations, and the use of electronic surveillance. I have participated in investigations involving the following types of drugs: cocaine and cocaine base, heroin, methamphetamine, marijuana, methylenedioxy-methamphetamine (MDMA), fentanyl, and LSD.

I have conducted or been involved in at least 500 complex, multi-jurisdictional, investigations. I am familiar with the ways in which narcotic traffickers conduct

1

GOVERNMENT EXHIBIT A

their business, including, but not limited to, their methods of importing and distributing illegal drugs, their use of communications facilities and transportation platforms to arrange for and coordinate those distributions, their use of codes to conduct drug transactions, financial transactions, and vehicles utilized by those traffickers to launder the proceeds of their illegal activities.

Based upon my training and experience in the investigation of drug trafficking, and based upon interviews I have conducted with defendants, sources, and other witnesses to, or participants in drug trafficking activity, I am familiar with the ways in which drug traffickers conduct their business, including the various means and methods by which drug traffickers import and distribute their drugs, their use of cellular telephones, digital display paging devices and calling cards to facilitate drug activity; and their use of numerical codes and code words to conduct their transactions. I am also familiar with the ways in which drug traffickers conceal, convert, transmit and transport their drug proceeds, including, but not limited to, the use of couriers to transport currency and proceeds, the use of third parties and nominees to purchase or to hold title to assets, and the use of offshore accounts.

I am aware that where an individual's income cannot possibly account for the level of wealth displayed and where evidence of drug trafficking exists, there is probable cause that the item of wealth is either a direct product of illicit activity or is traceable thereto.

The information contained in this declaration is based on personal knowledge I have gained from my participation in this investigation, conclusions I have reached based on my training and experience in the investigation of offenses involving controlled substance violations, and information and statements relayed to me by other DEA Agents, Task Force Officers, and state and local law enforcement officers who are involved in the investigation, reviewed reports of other law enforcement personnel and information provided by other sources.

I make this declaration based on evidence that there is sufficient probable cause to believe that Aaron Francisco Serrano CURANDERO (CURANDERO) and Maria Magdalena Serrano BERTRAM (BERTRAM), a/k/a, "Maria Beltran," a/k/a, "Mariana Flores-Martinez," a/k/a, and "Maria Magdalena Moreno Figueroa," were involved in drug trafficking within the Eastern District of North Carolina and by doing such, committed drug conspiracy/distribution violations and money laundering conspiracy and concealment/promotion violations as set forth in Title 21, United States Code, Sections 846 and 841. Further, the proceeds derived from such drug trafficking activities and the property involved in any financial transactions executed with the proceeds of the specified unlawful activity are forfeitable pursuant to Title 18, United States Code, Section 981 and Title 21, United States Code, Section 881.

1. This declaration is submitted in support of a Verified Complaint of Forfeiture of $291,740.00 in United States currency seized on December 1, 2023, from CURANDERO and BERTRAM.

2. On December 1, 2023, at approximately 6:50 PM, North Carolina State Highway Patrol (NCSHP) Trooper Michael Barton conducted a traffic stop on a minivan bearing North Carolina license plate HER8315 at Highway 64 near 1229 West Columbia, NC 27925. The traffic stop was conducted after Trooper Barton clocked the minivan moving 74 miles per hour in a posted 55 mile per hour zone.

3. CURANDERO was the driver and BERTRAM was the front seat passenger. Trooper Barton detected the order of alcohol upon exiting his patrol vehicle and detected the odor of alcohol emanating from CURANDERO's breath during his initial encounter with CURANDERO. CURANDERO initially claimed that he had not drank anything but later admitted that he drank beer with his lunch. CURANDERO stated the car was not his and a check of the vehicle registration revealed the vehicle was registered to a third-party not present, Michael Lopez HERNANDEZ. CURANDERO had difficulty keeping his head still, staying focused, and swayed while standing. Based on Trooper Barton's observations of CURANDERO's condition, he arrested CURANDERO and charged him for Driving While Impaired.

4 CURANDERO told Trooper Barton that BERTRAM could not drive. BERTRAM was removed from the vehicle in order to conduct the investigation. Trooper Barton requested the assistance of the Tyrrell County Sheriff's Office (TCSO) and TCSO Deputy William Boyd responded.

5. During the DUI investigation, BERTRAM attempted to enter the vehicle in the rear passenger compartment multiple times and failed to comply with the investigating officers' commands. At one point, investigators had to forcibly remove BERTRAM from the vehicle and noted that it appeared she was attempting to hide something. When Deputy Boyd pulled her out, he noted that there was an open container of alcohol. A search of the vehicle was conducted for evidence of the DUI violation for open containers. During this search, a backpack was found in a compartment within the passenger floorboard of the vehicle. Within this backpack, Deputy Boyd located a black plastic bag. Inside of this plastic bag were socks which contained a large amount of United States currency, later determined to be $291,740.00. Upon location of the United States currency, TCSO K9 Deputy Israel Roughton responded and deployed his police canine, K9 Havi. K9 Havi provided a positive alert on the rear of the minivan. CURANDERO was transported to the TCSO for processing. BERTRAM transported to the TCSO based on the remoteness of the area, her inability to drive, and for officer safety.

3

6. Based on this affiant's training and experience, along with the training and experience of other investigators working this case, it is common for drug traffickers to employ the assistance of other parties to transport illicit proceeds on their behalf. Additionally, it is a routine practice for individuals transporting illicit proceeds by vehicle to conceal such proceeds in hidden compartments within a vehicle in order for them to not be located. Indeed, while concealing the proceeds in a compartment hides their presence, it is also common practice to package such proceeds within other benign items to further conceal their presence, such as clothing.

7. TCSO Deputy Israel Roughton, accompanied by Deputy Boyd and translator Leticia Gonzalez conducted a recorded interview with BERTRAM. BERTRAM was advised her rights through the use of a translator and BERTRAM agreed to speak to law enforcement. BERTRAM advised she had over $120,000.00 in United States currency in the minivan that she claimed was money she had saved up for over 20 years and that she had the money in cash because she did not have a bank account. BERTRAM stated that she brought it from her house in Winston-Salem due to the fear of someone stealing it. BERTRAM stated that she and CURANDERO worked all the time and when they got paid, they would give their checks to a man in Greensboro to cash the checks at a store called "Victoria." BERTRAM was asked if she had any proof of the checks and she stated that the boss doesn't give them their checks back. BERTRAM further advised that they (BERTRAM and CURANDERO) bought the minivan from a man named, "Michael." BERTRAM did not know Michael's last name. According to BERTRAM, she and CURANDERO pay for the maintenance and registration of the car and Michael has the "plates." BERTRAM also advised that she did not lawfully enter the United States. At the conclusion of BERTRAM's interview, she was released.

8. Deputy Roughton, accompanied by Deputy Boyd and translator Leticia Gonzalez conducted a recorded interview with CURANDERO. CURANDERO was advised his rights through the use of a translator and CURANDERO agreed to speak to law enforcement. CURANDERO advised they were on their way home to Winston-Salem after working the week at the beach. CURANDERO was asked about the money in the minivan and he advised that half of the money was his and the other half belonged to BERTRAM. CURANDERO further advised that the last time he counted the money he had over $120,000.00. CURANDERO also advised that he had been saving the money for 20 years and didn't have a bank account, so he kept cash. CURANDERO stated he and BERTRAM worked for International Drywall at the time of stop. CURANDERO posted bond and was released.

9. On December 4, 2023, the Hyde County Sheriff's Office (HCSO) conducted a money line up using a police canine handled by Deputy Raymond Allen, K9 Argo. A positive alert was provided by K9 Arlo on the bag containing the United States currency.

4

10. On February 5, 2024, DEA's Asset Forfeiture Section received CURANDERO's and BERTRAM's claim forms petitioning for remission of the United States currency seized on December 1, 2023. CURANDERO and BERTRAM included copies of purported Form 1099-NECs. The Form 1099-NECs submitted show that the total earnings for CURANDERO and BERTRAM is nearly equal to the amount of United States currency located in the vehicle during the December 1, 2023 traffic stop. A check of the North Carolina Department of Employment Security records shows no wages earned for CURANDERO or BELTRAM (under the name "Maria Beltran") based on the social security numbers they provided.

11. Although CURANDERO and BERTRAM submitted documentation to support their claimed history of earnings, it is improbable that the money seized was derived from legitimate earnings because the earnings and the amount of United States currency seized were similar in total, which indicates that the specific United States currency seized is not the same United States currency CURANDERO and BERTRAM claimed as their accumulated earnings from their employment as reflected in the Form 1099-NECS. This is so because had this currency actually been the earnings stated in the Form 1099-NECs, the totals would be significantly different due to CURANDERO's and BERTRAM's need to use the currency to meet basic needs such as housing, transportation, food, and clothing. Further, CURANDERAO and BERTRAM both stated the seized United States currency was accumulated over a 20-year period, yet law enforcement officers involved in the seizure of the currency noted that most of the $100.00 bills were printed in recent years. Moreover, CURANDERAO and BERTRAM both stated they do not have a bank account. However, law enforcement database information reveals BERTRAM, under the alias, "Maria Magdalena Moreno Figueroa," was the holder of an account with the Latino Community Credit Union in August 2023, which undermines their claim that they did not use financial institutions.

12. Upon conducting routine deconfliction of this event with other law enforcement agencies within the area, it was learned that Homeland Security Investigations (HSI) Task Force Officer (TFO) B. Ayers had a parallel investigation. This investigation involved the registered owner of the vehicle, Michael Lopez HERNANDEZ, and his drug trafficking activities. Specifically, HSI agents in the Winston Salem area identified HERNANDEZ utilizing confidential sources and were aware of HERNANDEZ's dealings in controlled substances, namely methamphetamine. HSI agents have arranged to purchase controlled substances from HERNANDEZ, however, they have yet to do so and continue their investigative efforts to this day. Additionally, HERNANDEZ has a criminal history indicating multiple arrests for assault and controlled substance violations to include kidnapping and assault with a deadly weapon, assault on a female, possession of methamphetamine and marijuana up to ½ ounce, resulting in one misdemeanor

assault inflicting serious injury and one misdemeanor drug conviction for possession of drug paraphernalia.

13. BERTRAM, under the alias, "Mariana Flores-Martinez," was previously charged as an inadmissible alien under 8 U.S.C. § 1182 and removed from the United States on July 28, 2013. BERTRAM, once again under the alias, "Mariana Flores-Martinez, was arrested on August 1, 2013. BERTRAM was processed for expedited removal and removed from the United States on August 2, 2013. BERTRAM, under the alias, "Maria Magdalena Moreno Figueroa," was previously charged as an inadmissible alien under 8 U.S.C. § 1182 on April 27, 2014. There is no further information on the disposition of that charge.

14. Based upon all of the evidence and elicited responses from CURANDERO and BERTRAM and based upon the combined training and experience of the investigators, the bulk United States currency transported by CURANDERO and BERTRAM was clearly derived from the sale of controlled substances, and/or was used or intended to be used to promote and facilitate their drug trafficking activity.

## CONCLUSION

15. Based on the facts and circumstances related above, declarant maintains there is probable cause to believe that the aforementioned $291,740.00 in U.S. currency was furnished or intended to be furnished in exchange for a controlled substance or represents proceeds traceable to such an exchange. or was used or intended to be used facilitate a violation of the controlled substance Act, and is therefore subject to forfeiture to the United States pursuant to 21 U.S.C § 881(a)(6) and/or 18 U.S.C. § 981(a)(1)(C).

I declare under penalty of perjury that the foregoing information, as known or provided to me, is true and correct.

This the ___ day of May, 2024.

_____
Matthew A. Futch
Special Agent
U.S. Drug Enforcement Administration